**AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY, et al., Plaintiffs,**

v.

**Wallace G. WILKINSON, etc., Defendant.**

Civ. A. No. 88–102.

United States District Court, E.D. Kentucky, Frankfort Division.

Dec. 14, 1988.

**1298**

David L. Friedman, Louisville, Ky., for plaintiffs.

Pat Abell and Kevin Habel, Office of the Governor, Frankfort, Ky., for defendant.

## OPINION

BERTELSMAN, District Judge:

### INTRODUCTION

This is a civil rights action brought under 42 U.S.C. § 1983 by the American Civil Liberties Union of Kentucky and individual state taxpayers challenging the Commonwealth's construction and use of a structure resembling a biblical-age stable on the public grounds of the Kentucky Capitol building in Frankfort, Kentucky. Plaintiffs contend that state ownership and use of the structure is a violation of the Establishment Clause of the First Amendment. Operation of the State Capitol property is a function of the executive branch of government. Governor Wilkinson was named as the defendant, in his official capacity, which is equivalent to suing the state itself.

Plaintiffs filed a motion for a temporary restraining order and preliminary injunction. At a hearing on December 8, 1988, the parties filed a stipulation of facts (supplemented the next day) and agreed that the court should decide the case finally on the merits on the basis of the supplemented stipulation and the court's own inspection of the Capitol grounds.

Jurisdiction is conferred on this court by 28 U.S.C. § 1331, which provides for original jurisdiction over federal questions and by 28 U.S.C. § 1343, which provides for federal jurisdiction in actions authorized by 42 U.S.C. § 1983.

### FINDINGS OF FACT

The evidentiary facts herein are largely undisputed. The parties' stipulation is as follows:

### "STIPULATIONS OF FACT

"The parties hereby stipulate to the following facts:

"I. CONSTRUCTION AND LOCATION

"1. The Commonwealth of Kentucky (the state) has erected a nativity scene on the grounds of the State Capitol, in Frankfort, Kentucky.

"2. The State Capitol grounds are owned, operated and maintained by the state.

"3. The State Capitol is the seat of the Kentucky State government. It houses the offices of the Governor and Attorney General, the General Assembly (Legislature), and the Supreme Court of Kentucky.

"4. The nativity scene was constructed by state workers on state time and at state expense.

"5. The cost to the state of constructing the nativity scene was approximately $2,400, including labor.

"6. The nativity scene was constructed at the direction of executive branch officials, who are agents of the defendant.

"II. DESCRIPTION

"7. The nativity scene is approximately thirty (30) feet wide, twenty (20) feet deep and fifteen (15) feet high.

"8. The nativity scene is a barn or stable-like structure. It consists of a manger, a ladder leading to the loft, two large pottery jugs, railings and straw. A corral stands approximately twenty (20) yards in front of the nativity scene.

"9. The nativity scene is intended to symbolize the birth of Jesus Christ.

"10. The birth of Jesus Christ is of particular religious significance to Christians.

"11. A lighted Christmas tree stands approximately one hundred (100) yards behind the nativity scene, toward the State Capitol. The tree is approximately thirty (30) feet tall.

"12. Approximately seventy (70) lamp posts throughout the State Capitol grounds have each been decorated with strands of greenery and a red ribbon.

"13. The facades of the State Capitol and Annex have been decorated with similar greenery and red ribbons.

"14. Two parallel rows of trees along Capitol Avenue, totalling approximately thirty-five (35) in number, have been decorated with white lights.

"15. The nearest of these trees stands approximately fifty (50) yards from the nativity scene.

"16. A floral clock on the far side of the State Capitol has been decorated in a snowflake motif, with many multicolored lights.

"17. The exterior grounds of the State Capitol, comprising approximately twenty (20) acres, do not contain any Santa Clauses, elves, reindeer, sleighs, or candy canes.

"18. No other decorations or adornments are placed within one hundred (100) yards of the nativity scene.

"19. The nativity scene is located at the State Capitol end of Capitol Avenue. Capitol Avenue is the one-half mile long main entrance to the State Capitol grounds.

"20. Facing the State Capitol from Capitol Avenue, the nativity scene is in the foreground, with the decorated Christmas tree one hundred (100) yards behind it and the State Capitol behind it.

"21. The rotunda of the State Capitol is decorated with eight lighted trees, greenery and red ribbons.

"22. The Governor's Mansion, immediately adjacent to the Capitol grounds, is adorned with similar greenery, wreaths and lighted trees.

"III. INITIAL CEREMONY

"23. The nativity scene was first used at a ceremony held on Monday, November 28, 1988.

"24. The ceremony consisted of a Christmas Parade along Capitol Avenue, the lighting of the thirty (30) foot tree, a live reenactment of the nativity scene, and caroling.

"25. Participants in the live reenactment of the nativity scene were children from the Good Shepherd School.

"26. The Good Shepherd School is affiliated with the Good Shepherd Catholic Church.

"27. The state invited the Good Shepherd Catholic Church to furnish participants for the live nativity scene.

"28. The live nativity scene included individuals playing the roles of Joseph, Mary, Jesus, shepherds, angels and the three wise men. The scene also contained live camels, a donkey, goat and cow.

"29. The nativity scene was adorned to depict the Biblical version of Christ's birth.

"30. Caroling was performed by the Casey County High School band, the Kentucky State University choir, and a contingent from the Kentucky Opera Association.

"31. The parade consisted of more than one hundred (100) entries, including Santa Claus, reindeer, candy and toys.

"IV. SUBSEQUENT USE

"32. The nativity scene remains on the State Capitol grounds and will remain there until around Christmas Day.

"33. The state has permitted and will permit groups to use the nativity scene for their own live reenactments.

"34. The state will not permit the nativity scene to be used for any other purpose. Specifically, the state will not permit its use for secular reenactments of any kind, for reenactment of non-Christian themes, or for reenactment of Christian themes other than the nativity scene.

"35. Approval for use of the nativity scene must be secured from a state official in the executive branch. Scheduling is done by the state on a first-come basis.

"36. To date, the nativity scene has been used two additional times for live

reenactments. Each use was by children from the Good Shepherd School."

Following the hearing in open court, in response to questions by the court, the parties filed the following additional stipulations.[1]

37. "A state official accepts requests over the telephone for use of the site for a live presentation of a nativity scene, and if no other group has previously scheduled the site for that time period, permission is granted. Other than verifying that the proposed use is for a nativity scene, the official asks no questions about the nature of the proposed presentation, and there is no monitoring by the state of the performance.

38. "The steps of the State Capitol have been the site of numerous speeches, demonstrations and other public events.

39. "The state has no written or oral regulation concerning the use of the land immediately adjacent to or in front of the nativity scene."

### Inspection by the Court

In addition to the facts contained in the above stipulation, the court makes the following additional findings of fact, pursuant to F.R.Civ.P. 52(a), based on its personal inspection of the Capitol grounds and the approach to them along Capitol Avenue following the hearing in open court on December 8, 1988.

The controlling precedents require that the structure complained of be analyzed in the physical context of the surrounding holiday decorations. This display is unique in that its impact may vary as seen from differing perspectives. The court finds from its inspection that it is necessary to consider two perspectives in particular. A good part of the dispute between the parties is that each is viewing the scene from a different perspective.

Capitol Avenue is a broad, impressive divided thoroughfare. The stipulation recites that it is half a mile in length. It seems longer. Down the center of a wide

island dividing the traffic lanes stand numerous old fashioned light poles, perhaps 20 feet high, each with two street lights at the top. These poles are positioned to line up directly with the Capitol steps on which the structure complained of is located. All of the poles have been festively decorated with evergreen strands and red bows which are secular symbols of the holiday. As stipulated, there are also decorated trees along the two curblines.

The structure complained of here is obviously a rustic stable. As the parties have stipulated, it is a symbol of the Christian origins of the Christmas holiday. It is, however, unlike any of the nativity scenes described in the numerous cases cited below in this opinion.

The structure has apparently been designed to be viewed from afar, as one approaches the Capitol Building down the broad Capitol Avenue thoroughfare.

Also, unlike any outdoor nativity scene of that size the court has ever seen, this display does not contain animals and statues for spectators to file by and view. Unless a special pageant as described in the parties' stipulation is in progress, there would be no reason for a spectator to attempt to look into the structure. Indeed, during the court's formal inspection, there was no one in the vicinity of the display except the court's staff, the attorneys, reporters, and some spectators from the courtroom who had followed us over to witness our inspection. Except during the special pageants, the structure is not really a nativity scene (creche) at all.

Therefore, the court finds as a fact that the primary context in which the structure should be evaluated for purposes of this case is as viewed by an objective observer approaching the Capitol Building down Capitol Avenue.

The court finds further as a fact that such an objective observer, as did the court, would see the long vista of tall decorated light poles. Beyond the light poles

1. For ease of reference the additional stipulations have been re-numbered by the court consecutively with the first set of stipulations.

the objective observer would see, as did the court, the stable structure in issue.

Immediately above the stable, and directly in line therewith, the objective observer would see the 30–foot Christmas tree brightly entwined from top to bottom with a thick golden, ropelike strand.

Immediately above the Christmas tree, which plaintiffs acknowledge is a secular holiday symbol, the objective observer would see the dome of the Capitol.

Should our hypothetical objective observer (a cousin presumably of the ordinarily prudent man) continue down the avenue and alight from his car and go into the Capitol, he or she would pass by the stable structure as he climbed the steps on either side. As stated above, our observer would have no reason to pause, since the stable is empty. In passing, our objective observer would see undecorated evergreen trees in stands within five to ten feet of the structure and more decorated light poles along the steps.

After passing the structure and upon reaching the top of the steps, our observer would confront the highly decorated, thirty-foot high Christmas tree. Although this tree has been stipulated to be 100 yards from the stable structure, it dominates the scene from every perspective except from immediately in front of the structure where the structure itself blocks the view of the tree.

Should the observer continue into the Capitol Building or on a tour of the grounds, he or she would encounter the other extensive secular holiday decorations described in the parties' stipulation.

Therefore, in light of the above, the court finds as a fact, pursuant to F.R. Civ.P. 52(a), that an objective observer viewing the stable structure in the context of the holiday season and of its physical surroundings would interpret it not as an endorsement of religion or any religious doctrine, but merely as a reminder of the historical religious origins of Christmas.

The court further finds as a fact, pursuant to the above rule, that, if the Capitol grounds and the perspective looking down Capitol Avenue for some reason should not be considered, the undecorated evergreens located a few feet from the structure constitute sufficient secular adornment that the objective observer would reach the same conclusion.

The court further finds that the entire Capitol grounds and the approach thereto along Capitol Avenue is, as the defendant contends, the appropriate context within which to make these evaluations. In identifying this context, the court finds as a fact that perspective is more important than linear distances. Therefore, the fact that the decorated Christmas tree is 100 yards from the structure is without significance. Similarly, it is true that the structure is large, but it needs to be large to be viewed as it was primarily designed to be viewed, that is, from the perspective of one approaching along Capitol Avenue. As described above, as seen from this perspective, the size of the display helps to associate it with the secular decorations along the Avenue.

The court further finds as a fact that the mere location of the structure at the seat of state government would not change the conclusion of an objective observer that no religious endorsement has occurred.

There is one exception to the preceding finding, however. The court further finds that from one aspect—immediately in front of the structure and below it—the Christmas tree is not visible because the structure itself blocks it. The decorated light poles along Capitol Avenue are behind the observer at this location. Therefore, if the observer were to drive or walk into this area from the back or side entrances to the Capitol grounds and stand at this spot, he or she might reach the conclusion that the presence of the stable constituted an endorsement of Christianity by the Commonwealth.

The court further finds, however, that this impression could be dispelled by a prominent disclaimer truthfully stating: "This display was not constructed with public funds and does not constitute an endorsement by the Commonwealth of any religion or religious doctrine." That public

funds were expended on the display seems to be the factor that most offends those who object to it. Of course, to make the disclaimer truthful, the Commonwealth will have to be reimbursed by private parties for the expenditure of public funds.[2]

Further, the court finds that any impression the objective observer might have that there was an endorsement of religion would be further alleviated if there were a notice prominently posted in the area that the site immediately adjacent to the structure was available to any responsible religious or civic group that wished to put on a program related to the holiday celebration or for holiday displays (such as a menorah) constructed by other religions. To make the notice truthful, of course, the policy of limiting the use of the area to religious nativity pageants must be changed.[3]

The court further finds that the Commonwealth had a valid and sincere nonreligious purpose in erecting the structure complained of, namely, to further the spirit of the holiday season, to provide an open forum for holiday celebrations, and to remind citizens that, albeit one's origins are humble, one can make a contribution to society, or even history. As one observer was overheard to remark during the court's inspection, the rough-hewn stable has "a Kentucky flavor."

The court further finds that, if the truthful disclaimer and notice are posted as described above, any impression that might otherwise exist that the stable is intended to endorse religion will be eliminated. Thus, the primary effect of the display is not to advance religion.

The court further finds that the mere fact that a public official schedules use of the structure for nativity pageants does not constitute improper entanglement of the state with religious authorities.

It is not clear from the authorities whether the last three findings are issues of fact or issues of law, but the court makes the same findings under both headings.

## CONCLUSIONS OF LAW

### I.  *Standing*

Defendants in the instant case argue, as did the defendants in the lower court litigation in *Donnelly v. Lynch*, 691 F.2d 1029, 1031 (1st Cir.1982), *reversed on other grounds*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), that "the [mere] assertion of a personal constitutional right to a government that does not establish religion is insufficient to satisfy the requirements of Article III, at least in the absence of identifiable personal injury offered as a consequence of the alleged constitutional error." As did the defendants in *Donnelly*, they cite *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), for this proposition. Defendants in the instant case, however, are not able to contend, as did those in *Valley Forge*, that the plaintiffs are not state taxpayers or that no state funds have been expended in aid of the constitutional violation alleged.

In *Valley Forge*, a case involving the standing of *federal* taxpayers, the Supreme Court emphasized that it was not backing away from its earlier holdings that "standing may be predicated on non-economic injury," 454 U.S. at 485, 102 S.Ct. at 765. Accordingly, in the *Lynch* case it did not dispute the First Circuit's holding that non-federal taxpayers had standing as such "to challenge the city's ownership and use of [a publicly displayed] creche." 691 F.2d at 1032. *See also Hawley v. City of Cleveland*, 773 F.2d 736, 741 (6th Cir.1985).

Interpreting these cases, the Sixth Circuit has made its view clear "that the Supreme Court continues to allow suits by nonfederal taxpayers to enjoin unconstitutional acts affecting public finances." *Hawley*, 773 F.2d at 742; *see also Taub v. Commonwealth of Kentucky*, 842 F.2d 912 (6th Cir.1988) (there is "a distinctive treatment of standing when the Establishment

---

2.  As discussed in the opinion, *infra*, private parties stand ready to reimburse the state for the minimal expenditures of public funds.

3.  See discussion at note 52, *infra*.

Clause is involved"). It is sufficient injury that taxpayers would be "force[d] ... to assume special burdens to avoid unwelcome religious exercises." 773 F.2d at 740.

Plaintiffs have amended their original complaint specifically to allege that "the sectarian use of the state Capitol Grounds ... impairs each plaintiff's actual use and enjoyment of that property." Accordingly, the allegations of the amended complaint bring this case squarely within the rule of *Hawley.* It is indisputable that the plaintiffs are state taxpayers, that the state has expended its tax funds to erect and maintain the creche, and that the plaintiffs would be "force[d] ... to assume special burdens to avoid" confronting the unwelcome religious display. 773 F.2d at 740.

As more fully described in the findings of fact above, the Capitol grounds are clearly open to the public. They include walkways and gardens, an ornate clock display, lighting, a 30 foot Christmas tree, and elaborate Christmastime decorations and historical statuary inside the Capitol rotunda. The structure complained of is located near the front entrance to the dome and immediately in front of the 30 foot Christmas tree. Leading to it is a broad avenue whose lamp posts are bedecked with red and green ornamentation. Therefore, it is in fact positioned *amidst* these other decorations and would be virtually impossible to avoid. The plaintiffs clearly have standing to protest its presence.

## II. *Establishment Clause Decisions of Other Courts*

The plaintiffs contend that the stable structure described in the above findings of fact violates the Establishment Clause of the First Amendment to the Constitution of the United States. It is remarkable that what the framers were able to express in so few words has given rise to such a great volume of judicial and scholarly interpretation. Our analysis must begin with the text of the religion clauses of the First Amendment.

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof ..."

This amendment has become applicable to the states through the Fourteenth Amendment, as interpreted by the decisions of the Supreme Court of the United States.

Time, space, and the writer's energy do not permit a review of all of the decisions of the Supreme Court of the United States interpreting the Establishment Clause. It is necessary, however, to discuss some of the more recent decisions. This is itself a formidable task.[4]

The lodestar case is the decision of the Supreme Court of the United States in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). There the Court was presented with an attack on a large creche display constructed by a city in a park owned by a nonprofit organization. Both sides in this case and all decisions and articles since 1984 which have addressed the propriety of public displays associated with Christmas or Hanukkah have invoked *Lynch,* albeit with varying and conflicting interpretations.

These conflicts arise from the unfortunate, perhaps unavoidable, ambiguity in the majority opinion, which in turn arose out of the unusual facts of the case. The nativity scene under consideration in *Lynch,* as described in the majority opinion,[5] comprised

"... many of the figures and decorations traditionally associated with Christmas, including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads 'SEASONS GREETINGS,' and the creche at issue here."

McConnell, *Accommodation of Religion,* 1985 Sup.Ct.Rev. 1.

4. For comprehensive discussions of the massive body of law growing out of the First Amendment's religion clauses, see *Developments in the Law—Religion and the State,* 100 Harv.L.Rev. 1606 (1987) [hereinafter *Developments* ];

5. 104 S.Ct. at 1358.

The Court held that the nativity display did not violate the Establishment Clause. The Court recognized that, despite some statements made in some of its earlier opinions, including references to a "wall of separation between church and state," our Constitution does not "require complete separation of church and state; *it affirmatively mandates accommodation*, not merely tolerance, of all religions and forbids hostility toward any."[6]

Reiterating pronouncements in earlier opinions, the Court reemphasized that " 'we are a religious people whose institutions presuppose a Supreme Being.' "[7] It further observed that complete separation of government and religion in our nation was obviously contrary to the intent of the framers of the Constitution, who had contemporaneously pursued such practices as appropriating funds for payment of chaplains for the House and Senate and proclaiming a day of thanksgiving and prayer.[8]

Further, the Court rejected "a rigid, absolutist view of the Establishment Clause."[9] Each case arising under the Establishment Clause must be viewed in the light of its own facts and circumstances, the Court said, since "no fixed, *per se* rule can be framed."[10] This flexible approach was to be used, the Court held, in the application of the three-part test enunciated in its previous decision in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Court's discussion of the famous *Lemon* test is significant because many have contended that its three prongs should be literally construed and strictly applied. The *Lynch* Court, however, described the application of the *Lemon* test as follows:

"In the line-drawing process we have often found it useful to inquire whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion. *Lemon supra*. But, we have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area."[11]

Turning to the case before it, the Court stated that "the focus of our inquiry must be on the creche in the context of the Christmas *season*."[12] The Court further held that a religious purpose will not invalidate governmental action under the Establishment Clause unless the action is motivated *"wholly* by religious considerations."[13] If there is some legitimate secular purpose, the Court held, the action is not invalid.[14]

Concerning the "benefit" prong of the three-part test, the Court held:

"The dissent asserts some observers may perceive that the city has aligned itself with the Christian faith by including a Christian symbol in its display and that this serves to advance religion. We can assume, *arguendo*, that the display advances religion in a sense; but our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action. The Court has made it abundantly clear, however, that 'not every law that confers an "indirect," "remote," or "incidental" benefit upon [religion] is, for that reason alone, constitutionally invalid.' Here, whatever benefit there is to one faith or religion or to all religions, is indirect, remote, and incidental; display of the creche is no more an advancement or endorsement of religion than the Congressional and Executive recognition of the origins of the Holiday itself as

---

**6.** 104 S.Ct. at 1359 (emphasis supplied).

**7.** 104 S.Ct. at 1360, (quoting *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952)).

**8.** 104 S.Ct. at 1359–60.

**9.** 104 S.Ct. at 1361.

**10.** 104 S.Ct. at 1362.

**11.** *Id.*

**12.** *Id.* (emphasis supplied).

**13.** *Id.* (emphasis supplied).

**14.** 104 S.Ct. at 1363.

'Christ's Mass,' or the exhibition of literally hundreds of religious paintings in governmentally supported museums."[15]

Finally, the court held that merely erecting the creche did not unduly entangle the city with church authorities.[16]

To convey the spirit and tone of the Supreme Court's decision in *Lynch,* which is controlling of the case now before this court, the concluding paragraphs of the majority opinion bear quoting at length.

"Justice BRENNAN describes the creche as a 'recreation of an event that lies at the heart of Christian faith.' The creche, like a painting, is passive; admittedly it is a reminder of the origins of Christmas. Even the traditional, purely secular displays extant at Christmas, with or without a creche, would inevitably recall the religious nature of the Holiday. The display engenders a friendly community spirit of goodwill in keeping with the season. The creche may well have special meaning to those whose faith includes the celebration of religious Masses, but none who sense the origins of the Christmas celebration would fail to be aware of its religious implications. That the display brings people into the central city, and serves commercial interests and benefits merchants and their employees, does not, as the dissent points out, determine the character of the display. That a prayer invoking Divine guidance in Congress is preceded and followed by debate and partisan conflict over taxes, budgets, national defense, and myriad mundane subjects, for example, has never been thought to demean or taint the sacredness of the invocation.

"Of course the creche is identified with one religious faith but no more so than the examples we have set out from prior cases in which we found no conflict with the Establishment Clause. It would be ironic, however, if the inclusion of a single symbol of a particular historic religious event, as part of a celebration acknowledged in the Western World for 20 centuries, and in this country by the people, by the Executive Branch, by the Congress, and the courts for 2 centuries, would so 'taint' the city's exhibit as to render it violative of the Establishment Clause. To forbid the use of this one passive symbol—the creche—at the very time people are taking note of the season with Christmas hymns and carols in public schools and other public places, and while the Congress and legislatures open sessions with prayers by paid chaplains, would be a stilted overreaction contrary to our history and to our holdings. If the presence of the creche in this display violates the Establishment Clause, a host of other forms of taking official note of Christmas, and of our religious heritage, are equally offensive to the Constitution.

"The Court has acknowledged that the 'fears and political problems' that gave rise to the Religion Clauses in the 18th century are of far less concern today. We are unable to perceive the Archbishop of Canterbury, the Bishop of Rome, or other powerful religious leaders behind every public acknowledgement of the religious heritage long officially recognized by the three constitutional branches of government. Any notion that these symbols pose a real danger of establishment of a state church is far-fetched indeed."[17]

The *Lynch* decision is also noteworthy because of the concurring opinion of Justice O'Connor, in which she suggested a test for deciding Establishment Clause cases, that since seems to have been adopted by the Court as a whole as the law of the land.[18] As Justice O'Connor phrased it, "The central issue in this case is whether Pawtucket has endorsed Christianity by

**15.** 104 S.Ct. at 1364.

**16.** 104 S.Ct. at 1365.

**17.** 104 S.Ct. at 1365–66.

**18.** *American Civil Liberties Union v. City of Birmingham,* 791 F.2d 1561, 1563 (6th Cir.1986), citing *Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). *See also Stein v. Plainwell Community Schools,* 822 F.2d 1406 (6th Cir.1987). *But see* note 36, *infra.*

its display of the creche." [19] This "endorsement" test, according to Justice O'Connor, is to be applied in the following manner:

"The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid." [20]

Justice O'Connor also expressed her view that, in determining whether an endorsement has occurred, it is "the 'objective' meaning of the statement" conveyed by the display that is decisive.[21]

As has been stated above, the application of the *Lynch* decision by the lower federal courts has not been uniform. This is because of an ambiguity in the decision, namely, whether the Court had determined that the City in *Lynch* was not to be regarded as having "endorsed" religion because of the creche's occurrence in the context of the holiday season, or because of its physical setting among secular holiday decorations.[22]

The first federal appellate court to apply the *Lynch* decision was the United States Court of Appeals for the Second Circuit in *McCreary v. Stone*, 739 F.2d 716 (2d Cir. 1984), *aff'd by an equally divided Court sub nom. Board of Trustees v. McCreary*, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985). In this case, a creche scene was permitted by an incorporated village to be erected by a private religious group in a small public park. Having analyzed the *Lynch* decision at length, a unanimous court rejected the objection of those who sought to prohibit the display that the physical surroundings were the governing factor. The *McCreary* court interpreted *Lynch* as holding that such a display should not be viewed as an endorsement of

religion when considered in the context of the holiday season, rather than in the context of its physical surroundings. Therefore, the court held that the display was permissible if accompanied by a sufficient disclaimer of the city's intention to endorse religion. In addition, the court undertook an extensive application of the tripartite *Lemon* test and held that none of its precepts were violated.

A different view was taken by a divided panel of the United States Court of Appeals for the Sixth Circuit, whose decisions this court is obligated to follow. In *American Civil Liberties Union v. City of Birmingham, Mich.*, 791 F.2d 1561 (6th Cir. 1986), the court was confronted with a nativity scene erected on the front lawn of the city hall of the defendant city. The *Birmingham* court, per Chief Judge Lively, reviewed the *Lynch* decision of the Supreme Court, as must all courts considering these matters, and determined that, unless a nativity display was physically surrounded by secular decorations, it must be interpreted as constituting an endorsement of religion. Judge Nelson filed a strong dissent stating his conclusion that the *McCreary* seasonal context approach was a more faithful interpretation of the teaching of *Lynch*.

Judge Nelson was concerned that the majority's physical setting approach would bog the lower courts down in the details of a "Santa Claus too" test. That is, a governmentally sponsored nativity scene may be permitted provided that it is accompanied by "a sleighful of toys and a Santa Claus too." (Others have referred to the physical context approach as "the two plastic reindeer" test.)

Tongue in cheek, but nevertheless making a valid point, Judge Nelson observed:

"The application of such a test may prove troublesome in practice. Will a mere Santa Claus suffice, or must there also be a Mrs. Claus? Are reindeer needed? If so, will one do or must there

---

19. 104 S.Ct. at 1368 (O'Connor, J., concurring).

20. *Id.*

21. *Id.*

22. *See* L. Tribe, American Constitutional Law 1291–92 (2d ed. 1988) [hereinafter Tribe].

be a full complement of eight? Or is it now nine? Where in the works of Story, Cooley or Tribe are we to find answers to constitutional questions such as these?" [23]

The next case to be considered is *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir.1987). In that case a Jewish organization sought to enjoin the display of a nativity scene in the Chicago City–County Building. The display was privately owned but erected with City labor. The district court held that the Supreme Court's decision in *Lynch* was directly controlling and entered judgment for the City. The district court relied on the fact that the City–County complex was replete with a myriad of secular Christmas decorations and that the creche display " 'matched squarely the Christmas context contemplated by the Supreme Court in *Lynch.*' " [24]

Although the appellate opinion described in detail a panoply of secular and religious decorations, it reversed and enjoined use of the creche. The appellate court expressed its view that the Establishment Clause required "that government—at all levels—should stay out of religious affairs." [25] It held further that the very fact that the creche display was located in City Hall constituted an *ipso facto* government endorsement of religion. "Because City Hall is so plainly under government ownership and control," the court said, "every display and activity in the building is implicitly marked with the stamp of government approval." [26]

Judge Easterbrook filed a vigorous dissent. He agreed with the district court that *Lynch* was controlling and that the City had complied with its standards. He deplored the necessity of judges being involved in the parsing of the various aspects of holiday displays and being asked to decide such questions as whether white statues were more constitutionally acceptable than painted statues. He read *Lynch* as requiring only "that the government's entire activity celebrate all aspects of the holiday and not just the religious aspect." [27]

Concerning the majority's major premise, Judge Easterbrook jibed:

"Officials of Chicago will read with amusement the court's assertion that the City endorses whatever appears in City Hall. Do they all believe in Santa Claus, too?" [28]

Judge Easterbrook went on to discuss his own view of the proper interpretation of the Establishment Clause, arguing that the absence of governmental compulsion is the key factor. He recognized, however, that this view is not the law under current rulings of the Supreme Court.

*American Civil Liberties Union v. County of Allegheny*, 842 F.2d 655 (3rd Cir.1988), *cert. granted*, — U.S. —, 109 S.Ct. 53, 102 L.Ed.2d 32 (1988), which concerned the display of both a creche and a menorah during the holiday season. The creche was displayed inside the main entrance of the county courthouse and the menorah on the outside steps of the same building. The creche was the property of a local Holy Name Society. A disclaimer was also displayed. Other Christmas decorations, including a large Christmas tree, were located about the building.

Rejecting the district court's holding that the doctrine of *Lynch* validated these displays, the appellate court essentially followed the Seventh Circuit's "seat of government" gloss to the *Lynch* doctrine. For the Third Circuit majority, the fact that the creche and menorah were prominently displayed at a building "devoted to core functions of government" necessarily required a finding that "the city and county have tacitly endorsed Christianity and Ju-

23. 791 F.2d at 1569 (Nelson, J., dissenting).
24. 827 F.2d at 125.
25. 827 F.2d at 124.
26. *Id.*
27. 827 F.2d at 131 (Easterbrook, J., dissenting).
28. 827 F.2d at 132 (Easterbrook, J., dissenting).

daism and have therefore acted to advance religion." [29]

Judge Weis delivered a scathing dissent, accusing the Third, Sixth, and Seventh Circuit majorities of deliberately evading the doctrine of *Lynch* because of their disagreement with it. Judge Weis concluded that *Lynch* should be both the starting and ending points of the court's analysis in the case before it. Quoting a law journal article, he found "unpersuasive" the Sixth Circuit's *Birmingham* "adorned/unadorned" distinction. "*Lynch* simply does not support applying such a 'Two Plastic Reindeer' rule," he wrote.[30] Again turning to *Lynch*, Judge Weis said:

> "The tone of *Lynch* is unmistakable. I have found no indication that the Pawtucket display survived constitutional scrutiny because it was situated in a private park rather than a county courthouse, or because it closely resembled a miniature golf course with candy-striped poles, talking wishing wells, and cut-out elephants. *The civil government's recognition of the origins of Christmas during the holiday season simply was not perceived by the Supreme Court as a threat to the aims of the Establishment Clause.* The Court all but dismissed the appellant's claim as much ado about nothing and, reading the opinion, one can imagine the Court steadfastly resisting the temptation of chiding, 'Bah humbug!' " [31]

Similar views to those expressed in the Third and Seventh Circuit decisions, *supra*, were adopted by a district court just a month ago in *Smith v. Lindstrom*, 699 F.Supp. 549 (W.D.Va.1988).

### III. Differing Views Concerning the Establishment Clause in General and Lynch in Particular

■ The most recent issue of the *Kentucky Law Journal* contains a comprehensive article, which the court has found most helpful. *See* Myers, *The Establishment Clause and Nativity Scenes: A Reassessment of* Lynch v. Donnelly, 77 Ky.L.J. 61 (1988).

This article contains an exhaustive review of all of the cases discussed above and many more besides, as well as a catalogue of what must be virtually every scholarly article on the subject. I have never seen so many courts, judges, and scholars in such disagreement on any subject I have ever researched.

A distillation of the efforts of the indefatigable Professor Myers and his research assistants, together with the court's own research, reveals that there are at least the following views of the proper interpretation of the Establishment Clause:

1. Professor Tribe's thesis is that "government should be required to use secular tools unless only religious tools will suffice to pursue a relevant free exercise value." [32]

2. The Harvard Law Review's test is "whether the action is likely, from the perspective of the nonadherent, to carry coercive pressures or exclusionary messages" with all doubts to be resolved in favor of avoiding offending the sensibilities of religious minorities.[33]

3. Another view would recognize an area of "civil religion" in which practices apparently religious, such as a city's name being Corpus Christi, would be recognized as historical or traditional and not a violation of the Establishment Clause. However, religious symbols such as nativity scenes or menorahs displayed during the holiday season would not fall in the "civil religion" category.[34]

---

29. 842 F.2d at 662.

30. 842 F.2d at 668 (Weis, J., dissenting), quoting Note, *Of Crosses and Creches: The Establishment Clause and Publicly Sponsored Displays of Religious Symbols*, 35 Am.U.L.Rev. 477, 495 (1986).

31. 842 F.2d at 669 (Weis, J., dissenting) (emphasis supplied).

32. Tribe, *supra* note 21, at 1288 (2d ed. 1988).

33. *Developments, supra* note 4, at 1648.

34. *See Note, Civil Religion and the Establishment Clause*, 95 Yale L.J. 1237 (1986) (written by Yehudah Mirsky); *Developments, supra* note 4, at 1651 ff.

4. Apparently the view most accepted by the courts is Justice O'Connor's "endorsement" rubric, quoted earlier in this opinion. Although the Sixth Circuit has expressly held that this is the law of the land,[35] others are not so sure.[36]

5. For Professor Laycock, the touchstone is "equal access." This approach would ban publicly sponsored displays of Christian or Jewish holiday symbols, as "a little bit of establishment."[37]

6. Judge Easterbrook, the dissenter in the Seventh Circuit's creche case,[38] and Professor McConnell[39] believe that the presence or absence of governmental compulsion should be the deciding factor.

7. Professor Myers in the recent Kentucky Law Journal article holds that "the government does not violate the establishment clause unless it creates an institutional arrangement with a particular religious denomination that makes religious coercion possible. Under this approach, governmental involvement with a Nativity scene will rarely violate the establishment clause."[40]

Although the thought is frightening, it may be that there are as many proposed litmus tests for identifying an Establishment of Religion as there are judges and law professors. I am sure the reader is avidly waiting for me to go on for about twenty pages developing my own test, but I will refrain from doing so. Employing the dodge of the minister's double, I will merely observe: "There has been so much said, and, on the whole, so well said, that I will not occupy the time."[41] I am optimistic that you will be able to contain your disappointment.

Since I have tried to list above the various tests in a descending order of strict separationism, it may be seen that the "endorsement" formula, which the Sixth Circuit has held to have been adopted by the Supreme Court, is a middle-of-the road position. Perhaps that is why it is so severely criticized by those at both ends of the spectrum. It is certainly as workable as any test other than a total rejection of religion from all aspects of public life. This latter view, which would require changing the name of Corpus Christi to

---

**35.** *See American Civil Liberties Union v. City of Birmingham, Mich.,* 791 F.2d 1561, 1563 (6th Cir.1986), which relies on *School District of the City of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). See the highly illuminating discussion of the endorsement test in *Smith v. Lindstrom,* 699 F.Supp. 549 (W.D.Va.1988). Apparently, the endorsement test is to be used in conjunction with the tripartite *Lemon* test. *See* Myers, *supra,* at 73 n. 69.

**36.** *See* Myers, *supra,* at 73 n. 69. The majority opinion paid scant heed to the endorsement test in the Supreme Court's latest Establishment Clause decision. *See Bowen v. Kendrick,* — U.S. ——, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). *But see Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 2582, 96 L.Ed.2d 510 (1987) (primary purpose of Creationism Act to advance a particular religious belief endorsed religion); *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 2491–92, 86 L.Ed.2d 29 (1985) (primary purpose of statute requiring moment of silence for meditation or voluntary prayer endorsed religion); *School District of the City of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985) (parochial schools so sectarian that aid was an endorsement of religion). Justice O'Connor reiterated her advocacy of an endorsement approach in several other opinions where it was not employed by the majority. *See Corporation of Presiding Bishop v. Amos,* 483

U.S. 327, 107 S.Ct. 2862, 2874, 97 L.Ed.2d 273 (1987) (concurring opinion; majority employed *Lemon* test) (exemption of churches from religious discrimination in employment not an establishment of religion); *Estate of Thornton v. Caldor,* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (state statute giving private employees absolute right to day off on their Sabbath violated Establishment Clause; endorsement test not mentioned by majority); *Witters v. Washington Dept. of Services for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (aid to blind ministerial student did not violate Establishment Clause). Although this lack of consistency is somewhat disconcerting, down here at the grass roots in Frankfort, Kentucky, we must do the best we can with what we have.

**37.** *See* Myers, *supra,* at 93 n. 168.

**38.** *See American Jewish Congress v. City of Chicago,* 827 F.2d 120, 134 (7th Cir.1987) (Easterbrook, J., dissenting).

**39.** *See* Myers, *supra,* at 94 n. 172.

**40.** Myers, *supra,* at 115.

**41.** *See* Edward Everett Hale, "My Double and How He Undid Me," in IV Copeland's Treasury for Booklovers 310 (1927).

Texastown,[42] in my opinion, has little to recommend it.

The endorsement test seems to me to provide the least ambiguous, most practical and best balanced approach, as well as being binding on this court by reason of the Sixth Circuit opinion in *Birmingham*. It is also satisfactory to both parties in this case.[43]

### IV. *The Endorsement Test Applied*

It devolves upon this court now to attempt to synthesize meaningful principles from the conflicting authorities and apply them to the facts of this case.

It is clear from the statements of the Supreme Court appearing in *Lynch* and several other opinions [44] that the metaphorical "wall of separation" between church and state was never intended by the founding fathers. As the Supreme Court has pointed out, if the framers of the Constitution had intended to create such a "wall," they could not have consistently appropriated funds for religious purposes, such as salaries for chaplains to deliver invocations at sessions of Congress. Many disagree with the Supreme Court in this regard, but its decisions are binding on us all and must be borne in mind throughout this discussion.[45]

As previously discussed, the Sixth Circuit has held in *Birmingham* that the test whether state action violates the Establishment Clause is whether or not such action, objectively viewed, constitutes an endorsement of religion. This is the prevailing reading of the Supreme Court decisions to date. The plaintiffs agreed at oral argument that they were satisfied with this test.

This court agrees with dissenting Judges Easterbrook and Weis that under *Lynch* there is no justification whatever for an automatic "seat of government" disqualification for a governmentally sponsored religious display.

■ This court holds that the structure at issue in this case is to be scrutinized under *Lynch* in the context of the holiday season, and also under the Sixth Circuit decision in *Birmingham* in the context of its physical setting, to determine if it constitutes an endorsement of religion. This court holds that the fact that it is located on the grounds of the State Capitol, rather than, say, a state park, is not *per se* determinative. As Judge Weis pointed out in the excerpt from his dissent quoted above [46] the "seat of government" disqualification is not faithful to either the letter or spirit of *Lynch*.

This court is, of course, bound by the majority opinion of the Sixth Circuit in *Birmingham* and will make appropriate findings pursuant to its directive. Nevertheless, as one who has now actually applied the *Birmingham* rule in practice, I would respectfully offer the following reflections.

Last Thursday, I heard the able oral arguments of counsel in this case. A good portion of these arguments was concerned with whether the floral clock on the other side of the Capitol and the red bows on the Governor's Mansion could be considered as part of the "context" of the stable structure.

We then repaired to the Capitol grounds for an official inspection as part of the court proceeding. The *Louisville Courier Journal*—under the headline "U.S. judge tours state's creche in ACLU case"—the next day accurately described the scene as follows:

"FRANKFORT, Ky.—U.S. District Judge William O. Bertelsman, surround-

---

**42.** See Myers, *supra*, at 94 n. 170.

**43.** An excellent example of how the endorsement test may be applied as an elaboration of the tripartite *Lemon* test is found in the quotation from the Second Circuit's *McCreary* opinion, note 48, *infra*.

**44.** *See generally, Kendrick v. Bowen,* —— U.S. ——, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988);

*Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

**45.** See the extensive quotation from *Lynch, supra* note 17, to obtain a feel for the tone of that opinion, which is very far from subscribing to the "wall of separation" metaphor.

**46.** *Supra* note 30.

ed by a pack of attorneys, reporters, photographers and interested parties, inspected the state Capitol's Christmas display yesterday—including the controversial creche at the foot of the Capitol's front steps."

Our inspection caused quite a disturbance. Indeed, several members of the legislature interrupted their deliberations concerning implementation of the state lottery to come scurrying out to see what was going on. (Maybe they thought they could seize the opportunity for a sound bite.)

Respectfully, I must agree with Judge Nelson, who dissented in *Birmingham,* that such an inspection tour is an undue violation of the principles of federalism and comity. I submit that a federal judge should not be conducting inspections of Christmas decorations thought to be appropriate for its Capitol grounds by a sovereign state.

As I have often said from the bench, I have not been elected the Governor of any state, the county judge/executive of any county, the mayor of any city, nor a member of any legislative body. Nor have I been appointed the president of any college, the warden of any prison, or the superintendent of any school system. Certainly, none of these entities has been insane enough to hire me as an interior decorator or landscape designer to advise it on its holiday decorations.

These entities were intended under the Constitution of the United States to operate as independently as possible within their own spheres. The framers thought the separation of powers in and of itself to be an efficacious protection against tyrannical government quite aside from a constitutional bill of rights. Some did not even think a written bill of rights to be necessary, although I am glad they changed their minds.

My sole mandate to interfere with the affairs of state and local government is when it is necessary to vindicate rights protected by the Constitution or laws of the United States—and then as unobtrusively as possible.

Respectfully, albeit frankly, I don't believe a federal judge has any business inspecting the Christmas decorations on state property to determine if there is enough tinsel, two plastic reindeer, Santa Claus too, or for any other reason unless it is absolutely required in order to protect and defend the Constitution and laws of the United States. And I submit that it is not.

■ I submit that the approach of the Second Circuit in *McCreary* provides a model that avoids the necessity of such untoward intrusions by federal judges into state business. The Second Circuit considered the nativity display before it in the context of the holiday season, easily done from a distance. It also required an appropriate disclaimer of any government intent to endorse religion, a requirement also easily enforced from a distance.

The majority opinion in *Birmingham* has received a bum rap in some quarters. Judge Weis, in his dissenting opinion in the *Chicago* case, lumped the *Birmingham* majority with those judges whom he believed were adhering to separatist views contrary to the Supreme Court's opinion in *Lynch.* Regardless of the validity of this criticism as to the other opinions condemned by Judge Weis, I do not read *Birmingham* as an attempt to subvert *Lynch.*

*Birmingham* did not adopt a "seat of government disqualification." The display in *Birmingham was* at the seat of government. If this fact were an automatic disqualification in the eyes of the court, there would have been no need to consider the surrounding decorative context. Rather, I read the opinion of the *Birmingham* majority as an attempt to be extra certain that no government sponsored religious display be interpreted as an official endorsement of religion.

Nor can the majority opinion in *Birmingham* fairly be read to establish a "two plastic reindeer" test or a "Santa Claus too" test. There is nothing in *Birmingham* to indicate that it intended to hold that flamboyance was constitutionally mandated.

*Birmingham* merely requires the near presence of some secular decorations. De-

corations of the kind present on the Capitol grounds in Frankfort and the approaches thereto are sufficient under the *Birmingham* approach, and this court so holds. As indicated by the findings of fact herein, there are problems of perspective in applying the doctrine of *Birmingham* to this case, and the court will deal with those problems later in this opinion.

The approach of the majority in *Birmingham* has the virtue that, by requiring the physical presence of secular symbols, it makes certain that there is no doubt that government is not endorsing religion. It has the disadvantage, however, of requiring for its enforcement that the federal court interfere inappropriately in the day-to-day operations of state and local government. As noted above, I can speak from personal experience on this point. Also, the *Birmingham* rule is so fact-specific that it tends to assure that every government sponsored holiday display will engender a lawsuit.[47] These considerations are the essence of Judge Nelson's dissent.

I submit that the goals of the *Birmingham* majority can be accomplished equally well by the Second Circuit's requirement of a disclaimer. If the ultimate issue is whether government has *endorsed* a religion, that fact should be able to be settled by a disclaimer in almost every instance. Disclaimers are a common device in modern life. If the public accepts that "the views of the speaker are not necessarily those of this station," why should it not accept a disclaimer declaring that a nativity scene or menorah, displayed during the holiday season, does not constitute an endorsement of any religion or religious doctrine?

Regarding the legal effect of a disclaimer this court adopts the following rationale of the Second Circuit:

"... the Supreme Court has made reference to disclaimer signs as a proper means of diminishing the likelihood of appearance of support. *See Pruneyard*

*Shopping Center v. Robins*, 447 U.S. 74, 87, 100 S.Ct. 2035, 2044, 64 L.Ed.2d 741 (1980) (connection with message can be disavowed by 'simply posting signs'); *see also Lynch*, 104 S.Ct. at 1376 (Brennan, J., dissenting). We believe that a proper disclaimer message—especially when coupled with the presence of the valid secular purpose, the lack of excessive entanglement, the Village's general grants of access to its public properties and the publicity the Village's official views have received in Scarsdale—will ensure that no reasonable person will draw an inference that the Village supports any church, faith or religion associated with the display of a creche during the Christmas season at Boniface Circle."[48]

■ If a sovereign state or one of its local governments officially declares that its action in sponsoring a holiday display with religious overtones is not an endorsement of religion, what right has a federal court to reject such a disclaimer unless the circumstances demonstrate that it is an obvious sham? Again, this court expressly disagrees with the view that locating such a holiday display at the seat of government automatically constitutes such a sham. *Birmingham*, by which this court is bound, also implicitly but necessarily rejects this view.

I would note that *McCreary* was affirmed by the Supreme Court, albeit by an equally divided Court. Although this affirmance technically is not a controlling Supreme Court precedent, this court believes it is entitled to more weight than it has received in some quarters.

■ Turning to the facts before it, this court finds that from every perspective but one the Commonwealth's holiday display satisfies the *Birmingham* requirements. I have tried to spell this out very precisely above in the formal findings of fact.

---

**47.** As observed in the December 18, 1988, *National Law Journal:* " 'Tis the season for office parties, Santa Claus, carolers and creche suits.
"The creche suit, of course, is not this year's designer original. It is fast becoming a holiday tradition as local governments continue to search for that constitutional combination of Christmas, religion and the First Amendment."

**48.** *McCreary v. Stone,* 739 F.2d 716, 728 (2d Cir.1984).

From that one perspective, immediately in front of and below the stable structure, the relationship of the accompanying holiday decorations, especially the Christmas tree, to the structure is not apparent. To make it clear to an objective observer, viewing the structure from this perspective, that the structure is not an endorsement of religion, this court holds that the addition of a disclaimer is necessary to satisfy the *Birmingham* standard.

The court notes that the Second Circuit in *McCreary* expressly recognized the authority of the district court, in the exercise of its equitable powers, to require and even prescribe the contents of an appropriate disclaimer where necessary to make it clear that a display was not to be construed as an endorsement of religion.[49]

Here, the disclaimer should read, as indicated in the findings of fact above, that the state intends no endorsement of religion. It should also declare that no public funds have been expended on the structure. Of course, to make the latter declaration truthful, the state must find a means to defray the minimal cost of the structure with private funds. The *amicus curiae* brief of the Rutherford Institute of Kentucky, Bluegrass Chapter, represents to the court (p. 2) that "Offers have been made by private citizens to fully reimburse the State for its expenditures relating to the Structure."

▪ The fact that public funds, although in a minimal amount in relation to the Commonwealth's overall budget, were expended on the structure has caused the plaintiffs and some members of the citizenry great concern. This is understandable.

However it must be noted that the expenditure of public funds does not, under the prevailing precedents, of itself require the court to find that an establishment of religion has occurred. Public funds may constitutionally be expended for a religiously related purpose, provided that the

expenditure survives the tripartite *Lemon* test.

The nativity displays in both *Lynch* and *McCreary* involved expenditures of public funds.[50] However, the facts of the present case, particularly the requirement of applying the Sixth Circuit's physical surroundings test from at least two perspectives, present special problems.

As the court observed in its findings of fact herein, an objective observer who did not approach the structure down Capitol Avenue, but observed the structure from a perspective from which the most significant surrounding decorations were not visible, might get the impression that the structure was intended as an endorsement of Christian doctrine.

The court has found that a forceful disclaimer is necessary to rebut this impression. If that disclaimer could include a statement that no public funds had been expended on the display, the court finds that any ambiguity would be removed. Since private contributors stand ready to reimburse the state for all expenditures, the court's requiring such reimbursement as a condition to continuing the structure would constitute a minimal interference with state affairs.

Therefore, as part of its exercise of equitable powers in requiring an appropriate disclaimer,[51] the court will require that the disclaimer declare that no state funds are being expended on the display in issue and take steps to assure that that statement is accurate.

▪ The plaintiffs object to the use of the structure by local churches for nativity pageants. This has only occurred twice and the structure's availability for such use is apparently not actively promoted by the Commonwealth.

At the court hearing on December 8, in response to questioning by the court, counsel stated that presumably any civic or

49. 739 F.2d at 728.

50. *See also Bowen v. Kendrick,* —— U.S. ——, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (grants to religious organizations for purpose of adolescent sex education upheld); *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (salary for chaplain of state legislature).

51. *Supra* note 48.

religious group could use the area immediately adjacent to the structure for a holiday pageant or display. Also, the court was told, the Jewish community was welcome to erect a seasonal holiday display, such as a menorah, there.

The court directed that a supplemental stipulation be filed accurately delineating these policies. This stipulation appears in the findings of fact, *supra*, and may be seen to be inconsistent with the statements at the hearing. Apparently only nativity pageants are now permitted within the structure and there are no existing regulations regarding use of the area immediately adjacent to the structure.

Constitutionally, this presents an unacceptable situation, but one easily remedied. It is stipulated that the area at the foot of the Capitol steps is a traditional open forum. Teachers and others have staged demonstrations there to proclaim their grievances on various issues. Because the area is a recognized public forum, a religious pageant or ceremony could not be constitutionally excluded from it.[52] Of course, in the use of such a forum, there can be no preference for one religion over another, or exclusion of secular organizations or displays. If the open forum area is made available on an even-handed basis to all citizens and organizations, it is not a valid objection that some of them are religious persons or groups.[53]

Scheduling such use does not involve the state in undue entanglement with religious groups. Nor does making a public forum site available to them along with others who wish to use it "confer any imprimatur of State approval on religious sects or practices." [54]

Therefore, to alleviate any misunderstandings regarding discriminatory usage of the structure by church groups, which otherwise might be interpreted as an endorsement of religion, the court holds that a written non-discriminatory usage policy must be adopted, and that a written notice thereof must be prominently posted in the immediate area of the structure explaining such policy to the public. The written policy and notice should make it clear that the area is available to all persons and organizations for use on a non-discriminatory basis. The power of the state to impose reasonable non-discriminatory time, place, and manner restrictions should enable it to prevent any inappropriate use of the facilities.

I wish to emphasize that these policies are actually already constitutionally mandated by reason of the open forum doctrine. The notice is only required to inform the public of the policies so an objective observer's fears that the Commonwealth is endorsing a religion will be allayed.

## SUMMARY AND CONCLUSION

Because of the necessity of undertaking a detailed factual analysis and of discussing the multi-faceted judicial and scholarly opinions which review the Establishment Clause in general and religious displays in particular, this opinion has necessarily become somewhat lengthy. Its salient points, however, may be summarized as follows:

1. Although the application of the Establishment Clause in various individual situations is in a state of flux, one proposition is irrefutable. Recent decisions of the Supreme Court of the United States incontrovertibly reject the concept of a "wall of separation" between church and state. If the wall ever existed, it has now been rehabbed by the contemporary opinions of the high Court to the point where it is more like a wrought iron fence—still a definite barrier, but permitting communication from one side to the other.[55]

2. Many citizens, indeed many judges, do not approve of this evolution, believing

---

**52.** *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (public college facilities generally available to student groups must also be made available to religious organizations). See discussion in *McCreary v. Stone*, 739 F.2d 716, 723 ff. (2d Cir.1984).

**53.** *McCreary*, 739 F.2d at 727.

**54.** *Widmar*, 454 U.S. at 274, 102 S.Ct. at 276; *McCreary*, 739 F.2d at 727 (applied specifically to display of nativity scene).

**55.** *See* opinion, *supra* at pp. 1303 ff.

sincerely that in this area "good fences make good neighbors." This court, however, as must we all, is obligated to adhere to the principles enunciated by the Supreme Court. As soon as we fail to do so, substituting our own views, we have chaos.

3. Some of the decisions discussed in the above opinion have not been faithful to this precept. As a result, as has been noted in both the legal and popular press, we may now anticipate a sleighful of lawsuits and St. Nicholas too at every yuletide. This unwelcome addition to our holiday traditions does little to enhance the feelings of good will that should be their hallmark.

4. The test to be applied in deciding this case is: Does the Commonwealth's stable structure, in the eyes of an objective observer, constitute an endorsement of religion or religious doctrine? If it does not, it is constitutional.[56]

5. The appropriate physical context within which the structure is to be evaluated is the Capitol grounds and the approaches thereto along Capitol Avenue, as described in the findings of fact which appear at the beginning of this opinion.

6. When considered in this physical context, the holiday decorations on the Capitol grounds and along Capitol Avenue are sufficient, when considered with the seasonal nature of the display, that the presence of the stable structure would not be interpreted by an objective observer as an endorsement of religion.[57]

7. There is no automatic constitutional disqualification of the display merely because it is located at the seat of government, as some courts have held. Such holdings are contrary to the *Lynch* decision, the controlling Supreme Court precedent, and to the *Birmingham* decision, the controlling Sixth Circuit precedent.[58]

8. There is an exception to finding No. 5 above. From one location, immediately in front of the stable structure, an objective observer would not see the display in the proper perspective, because the structure itself blocks the view of the Christmas tree described in the findings of fact. Further, the secular holiday decorations along Capitol Avenue and on the Capitol grounds are not seen in conjunction with the display from this point.

9. A disclaimer is necessary to make it clear to an objective observer at this location that the structure is not to be construed as an endorsement of religion by the state. This disclaimer should state in substance: "This display was not constructed with public funds and does not constitute an endorsement by the Commonwealth of any religion or religious doctrine."[59]

10. Although the expenditure of public funds for incidental religious purposes is not automatically unconstitutional, the special circumstances of this case empower the court to require that any public expenditures involved herein be defrayed with private funds.[60]

11. Since the area at the foot of the Capitol steps is a traditional public forum, religious and civic groups desiring to erect holiday displays or hold holiday observances at the site must be permitted to do so, subject to reasonable time, place and manner restrictions. Therefore, making the structure available for religious pageants is not unconstitutional. The "initial ceremony" described in the findings of fact seems to the court to be an excellent proper use of the facility. Indeed, the plaintiffs said at oral argument that they did not object to it. However, a notice must be posted that the area is available to all responsible religious and civic groups or interested individuals to hold holiday pageants or ceremonies or place holiday displays. This notice together with the disclaimer mentioned above will alleviate any impression an objective observer might have that the stable structure constitutes an endorsement of religion rather than a

**56.** *See* opinion, *supra* at pp. 1308 ff.

**57.** *See* opinion, *supra* at pp. 1298 ff.

**58.** *See* opinion, *supra* at pp. 1310 ff.

**59.** *See* opinion, *supra* at pp. 1312 ff.

**60.** *See* opinion, *supra* at pp. 1313 ff.

holiday observance.[61]

An order will be entered concurrently herewith permitting continuance of the structure during the holiday season, subject to the conditions prescribed above. The court will maintain continuing jurisdiction to assure compliance.

### JUDGMENT AND ORDER

Pursuant to the Opinion filed concurrently herewith, the court being advised,

IT IS ORDERED AND ADJUDGED as follows:

1. That plaintiffs' request for an injunction herein prohibiting the maintenance of the stable structure described in the Opinion and its use for pageants, be, and it is, hereby DENIED, and the Commonwealth shall be permitted to maintain and use such structure, *PROVIDED HOWEVER*, that the Commonwealth comply with the following terms and conditions.

A. That all past and future expenditures of public funds in connection with the display described in the Opinion be defrayed by private contributions;

B. That a disclaimer be prominently displayed immediately in front of the stable structure, readable from an automobile passing on the street directly in front of the structure, which disclaimer shall read substantially as follows:

"This display was not constructed with public funds and does not constitute an endorsement by the Commonwealth of any religion or religious doctrine."

C. That a notice be prominently posted in the immediate area of the stable structure advising the public that the area, as a public forum, is available to all responsible citizens and civic and religious groups for holiday ceremonies, pageants or displays;

D. That the Commonwealth adopt a formal written policy consistent with the notice, which may contain any reasonable time, place and manner restrictions the Commonwealth wishes to impose.

2. The Commonwealth shall have five (5) calendar days to comply with such conditions, failing which the plaintiffs may apply to the court for further relief.

3. The court shall retain continuing jurisdiction of this matter, pursuant to its equitable powers, to assure compliance with the conditions set forth herein.

---

**61.** *See* opinion, *supra* at pp. 1313 ff.