**AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY, et al., Plaintiffs–Appellants,**

v.

**Wallace G. WILKINSON, Governor of Kentucky, Defendant–Appellee.**

Nos. 89–5049, 89–5258.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 16, 1989.

Decided Feb. 8, 1990.

Rehearing and Rehearing En Banc Denied April 17, 1990.

David A. Friedman (argued), American Civil Liberties Union of Kentucky, Louisville, Ky., for plaintiffs-appellants.

J. Patrick Abell, Gen. Counsel (argued), Kevin Hable, Office of the Governor, Frankfort, Ky., for defendant-appellee.

Before WELLFORD and NELSON, Circuit Judges, and SUHRHEINRICH,* District Judge.

DAVID A. NELSON, Circuit Judge.

During the 1988 Christmas holiday season, the Commonwealth of Kentucky erected a rustic stable on the grounds of the state capitol in Frankfort. The stable was furnished with a manger, two large pottery jugs, a ladder, railings, and some straw, but not with the figurines or statues commonly found in a crèche.

On at least three occasions, church groups were permitted to use the stable for pageants in which the biblical story of the birth of Jesus was reenacted by living people. Before entry of the order that is before us in this appeal, the State's intention had been to permit groups to use the stable for that purpose alone.

Alleging that the Commonwealth's conduct constituted an establishment of religion in violation of the First and Fourteenth Amendments, the American Civil Liberties Union of Kentucky and three Kentucky citizens brought the present action against the Governor. The complaint ended with a prayer for declaratory relief, an injunction against the conduct complained of, and such further relief as the plaintiffs might be entitled to.

After conducting a hearing and viewing the site personally, the district court entered a judgment order establishing the following conditions:

—That a notice be prominently displayed in the immediate area of the stable advising that the area is a public forum "available to all responsible citizens and civic

* The Honorable Richard F. Suhrheinrich, United States District Judge for the Eastern District of Michigan, sitting by designation.

and religious groups for holiday ceremonies, pageants or displays;"

—That the Commonwealth adopt a formal written policy consistent with the notice;

—That all expenditures of public funds in connection with the display be defrayed by private contributions; and

—That a disclaimer be prominently displayed in front of the stable, in letters big enough to be read from an automobile passing on the street before it, stating that the display "was not constructed with public funds and does not constitute an endorsement by the Commonwealth of any religion or religious doctrine."

The order gave the Commonwealth five days to comply. The injunction sought against maintenance of the stable was denied on the proviso that the Commonwealth comply with the conditions set forth in the order. The district court retained jurisdiction to assure compliance.

The plaintiffs appealed. There was no cross-appeal by the defendant. The principal issue before us, as we see it, is whether maintenance of the stable under the conditions established by the district court constitutes an "endorsement" of Christianity by the Commonwealth. Concluding that it does not, we shall affirm the district court's judgment.

## I

Kentucky's state capitol, which houses the offices of the Governor and Attorney General, the General Assembly, and the Supreme Court, is situated on grounds containing approximately 20 acres of land. The main entrance to the capitol grounds is a broad and imposing thoroughfare, one-half mile in length, called Capitol Avenue.

In the center island of Capitol Avenue stands a row of old-fashioned light poles. During the 1988 Christmas season, these light poles were decorated with evergreen strands and red bows. In addition, two parallel rows of trees along Capitol Avenue were decorated with white lights. Approximately 70 lamp posts situated on the capitol grounds were decorated with strands of greenery and red ribbons. The facade of the capitol building was decorated with similar greenery and ribbons, as were light poles along the capitol steps. The Governor's mansion, immediately adjacent to the capitol grounds, was adorned with greenery, wreaths, and lighted trees. The rotunda of the capitol was decorated with eight lighted trees, greenery, and red ribbons. Outside the capitol building, in a direct line between it and Capitol Avenue, was placed a lighted Christmas tree 30 feet in height. The Christmas tree was entwined from top to botton with a golden, rope-like strand.

Approximately 100 yards toward Capitol Avenue from the Christmas tree was the stable (also called the "barn" or "nativity scene") that gave rise to the present lawsuit. The structure was about 15 feet in height, and its floor area was about 30 feet by 20 feet. Approximately 20 yards from the stable was a corral. From the Capitol Avenue entrance, an observer would see the corral and stable at the end of the line of decorated light poles, with the brightly decorated Christmas tree above the stable and the dome of the capitol above the Christmas tree. Undecorated evergreen trees were placed in stands five to ten feet away from the stable. There was an area directly in front of the stable from which the Christmas tree would not be visible.

The stable was constructed by the Commonwealth at a total cost of approximately $2,400. Erected late in November, it was to be removed around Christmas Day. Among the rather extensive holiday decorations, the stable was apparently the only element not considered secular in nature.

The stable was first used on Monday, November 28, 1988, when children from a Roman Catholic school staged a live nativity scene there in connection with a Christmas parade along Capitol Avenue and a ceremonial lighting of the Christmas tree.[1] Children from the school played the roles

---

1. The parade consisted of more than 100 entries, we are told, including floats with Santa Claus, reindeer, candy and toys.

of Joseph, Mary, Jesus, shepherds, angels, and the three wise men. The scene also featured live camels, a donkey, a goat, and a cow. Carols were performed by a county high school band, the Kentucky State University choir, and a contingent from the Kentucky Opera Association. All of this activity went on in front of the capitol steps, which had been the site of numerous speeches, demonstrations and other public events in the past. The area is, as the district court found, "a recognized public forum."

The stable was used for the presentation of live nativity scenes on two occasions subsequent to November 28. On each of these occasions the scene was put on by children from the same Catholic school. It has been stipulated that "the nativity scene" (apparently meaning the stable alone) was intended to symbolize the birth of Jesus Christ—an event, the stipulation reminds us, "of particular religious significance to Christians."

## II

The plaintiffs filed a verified complaint on December 2, 1988. The complaint asserted, on information and belief, that the challenged structure "will only be used for recreation of the nativity scene," and that neither non-Christian religious groups nor secular groups would be permitted to use it at all. Unless continued maintenance and use of the structure were enjoined, the complaint alleged, the plaintiffs—three of whom were identified as adult citizens of the Commonwealth—would suffer irreparable harm in the form of deprivation of rights secured by the Establishment Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment. An amendment to the complaint filed on December 14, 1988, alleged that "[t]he sectarian use of the State Capitol grounds, as

described [in the complaint], impairs each plaintiff's actual use and enjoyment of that property."

It never became necessary for the defendant to file an answer to the complaint. The plaintiffs moved for a temporary restraining order and a preliminary injunction, and the district court scheduled a hearing on these motions for December 8, 1988. On December 6 the defendant moved for dismissal of the complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P.; the defendant asserted that the plaintiffs lacked standing to maintain the action, that the display complained of had a secular purpose, that its primary effect was not to advance any particular religion, and that there was no impermissible entanglement between the state and religion.

On the day of the hearing, the parties presented the district court with an extensive stipulation of facts. It was agreed that each side would be heard both on the issue of standing and on the merits, the hearing on the merits being consolidated with that on the preliminary injunction. See Rule 65(a)(2), Fed.R.Civ.P. Oral arguments were given by the parties and by two amici. Following the arguments, the court (accompanied by counsel) conducted a view of the capitol grounds and their immediate environs. An additional stipulation of facts was filed the following day.

On December 14, 1988, the court filed an extensive opinion—now reported at 701 F.Supp. 1296—concluding (a) that the plaintiffs had standing to protest the presence of the stable on the capitol grounds, and (b) that the stable would not be unconstitutional if the conditions we have already described were complied with. The opinion was accompanied by a judgment order, *id* at 1316, permitting continuance of the structure during the holiday season subject to these conditions.[2] The Governor evi-

---

**2.** In their entirety, the conditions read thus:

"A. That all past and future expenditures of public funds in connection with the display described in the Opinion be defrayed by private contributions;

"B. That a disclaimer be prominently displayed immediately in front of the stable structure, readable from an automobile pass-

ing on the street directly in front of the structure, which disclaimer shall read substantially as follows:

'This display was not constructed with public funds and does not constitute an endorsement by the Commonwealth of any religion or religious doctrine.'

(Footnote 2 continued on p. 1102)

dently decided to accept the court's conditions, and the plaintiffs perfected a timely appeal.

### III

The Governor contends on appeal, as he did in the district court, that the plaintiffs lack standing. Like the district court, we would be reluctant to dispose of the case on that ground. In *Hawley v. City of Cleveland*, 773 F.2d 736, 739–40 (6th Cir. 1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986), where the plaintiffs alleged that the maintenance of a chapel at Cleveland Hopkins Airport impaired their use and enjoyment of the airport facilities, we held that the plaintiffs, who were Cleveland residents, had standing. See also *Kaplan v. City of Burlington*, 891 F.2d 1024 (2d Cir.1989) (residents of Burlington, Vermont, had standing to litigate constitutionality of city's allowing a menorah to be displayed in City Hall Park).

As to the substance of the appeal, the oral argument in this case disclosed a significant difference of opinion between the parties as to whether the conditions imposed by the district court required that the area within the stable itself be treated as a public forum. The plaintiffs interpret the order as requiring that only the area outside the stable be made available for general use, while the defendant interprets the public forum requirement as extending to the entire area, including the space within the stable, subject only to such reasonable "time, place and manner" restrictions as the Commonwealth may impose.

We agree with the defendant's interpretation. At one point in the opinion, it is true, the district court said that it would help alleviate any impression that the Commonwealth was endorsing religion if there were posted in the area a prominent notice "that the site *immediately adjacent* to the structure was available to any responsible religious or civic group...." 701 F.Supp.

at 1302 (emphasis supplied). Later in the opinion, however, the court expressed itself as follows:

> "Apparently only nativity pageants are now permitted *within* the structure and there are no existing regulations regarding use of the area immediately adjacent to the structure.
>
> Constitutionally, *this presents an unacceptable situation*, but one easily remedied." *Id.* at 1314 (emphasis supplied).

It is not entirely clear to us whether the district court thought that regulations regarding the adjacent area would make it constitutionally acceptable to permit only nativity pageants within the structure, but we believe that under any circumstances such a limitation on the use of the area within the structure would present a serious constitutional problem. That problem would be resolved by giving the court's order what seems to us to be its most natural reading, *i.e.*, that the entire area in question, including the area within the stable, is to be treated as a public forum. Where a public forum has been created, an "equal access" policy, extending to both religious groups and non-religious groups, is not incompatible with the Supreme Court's Establishment Clause cases. *Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981).

In *Kaplan v. City of Burlington, supra,* the Court of Appeals for the Second Circuit did not read *Widmar v. Vincent* as teaching that a private religious group could properly be allowed to erect a menorah in a public park, even though the park was a traditional public forum. Judge Meskill, who dissented, thought *Widmar v. Vincent* was controlling. Judge Meskill's dissent strikes us as persuasive, but the case at bar is factually distinguishable from *Kaplan* in any event; here the symbol at

Footnote 2 continued

"C. That a notice be prominently posted in the immediate area of the stable structure advising the public that the area, as a public forum, is available to all responsible citizens and civic and religious groups for holiday ceremonies, pageants or displays;

"D. That the Commonwealth adopt a formal written policy consistent with the notice, which may contain any reasonable time, place and manner restrictions the Commonwealth wishes to impose."

issue is itself a public forum, while the symbol in *Kaplan* was not.

Under the district court's order in this case, as we read it, the Commonwealth may not arbitrarily refuse to accommodate a civic group that wishes to use the stable for a pageant featuring Santa and his reindeer, or a non-Christian religious group that wishes to celebrate a December holiday there, or a secular choir that wishes to present a program featuring songs like "Jingle Bells," "White Christmas," "Santa Claus is Coming to Town," and "Rudolph the Red–Nosed Reindeer." The fact remains, however, that the structure will, from time to time, be used for live nativity scenes. Even when not being used by anyone, moreover, the stable will, for many, symbolize—as it was intended to—the birth of Jesus, the historical fact commemorated by the holiday. That being so, we must ask whether, notwithstanding *Widmar v. Vincent*, the presence of such a Christian symbol among the other holiday decorations put up by the Commonwealth signifies a governmental endorsement of Christianity.

At least in the absence of the express disclaimer ordered by the district court, the most recent precedents suggest an affirmative answer to that question. In *American Civil Liberties Union v. City of Birmingham*, 791 F.2d 1561 (6th Cir.), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986), for example, this court upheld an injunction prohibiting a Michigan city from displaying a city-owned nativity scene on the front lawn of the city hall at Christmastime. The area had other holiday decorations not unlike those in this case; there was a Christmas tree with colored lights immediately behind the nativity scene, and the city had decorated perhaps a dozen other evergreen trees on the city hall property. See 791 F.2d at 1570, n. 4 (Nelson, J., dissenting). The city, moreover, had decorated the trees in the central business district surrounding the city hall with over 1,000 strings of Christmas lights. *Id.* The panel majority (Lively, C.J., and Merritt, J.) did not consider these secular decorations sufficient to avoid the prohibition of the Establishment Clause, and the Supreme Court's subsequent ruling in *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. ——, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), makes it clear, we think, that the Supreme Court would have agreed with Judges Lively and Merritt in *City of Birmingham*.

■ The present case differs from both *City of Birmingham* and *Allegheny County* in that here we have a structure capable of use for non-religious purposes, and the structure is unaccompanied by any display of religious figurines or statues. The nativity scene in *City of Birmingham* was comprised *solely* of "figurines depicting the Christ Child, the Mother Mary, Joseph, three costumed shepherds, and several lambs," 791 F.2d at 1562, while the *Allegheny County* crèche included "figures of the infant Jesus, Mary, Joseph, farm animals, shepherds, and wise men, all placed in or before a wooden representation of a manger...." 492 U.S. at ——, 109 S.Ct. at 3094, 106 L.Ed.2d at 486.

On the other hand, at least after the conclusion of the Christmas parade, we have in this case no figure of Santa Claus, reindeer, carolers, clowns, elephants, teddy bears, or other secular figures of the sort that have sometimes helped confer constitutional legitimacy on governmental Christmas displays incorporating crèches. See, *e.g., Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). In the absence of any figures at all, sacred or secular, the stable alone would probably strike Justice O'Connor's "reasonable observer" (see *Witters v. Washington Department of Services for the Blind*, 474 U.S. 481, 493, 106 S.Ct. 748, 754–755, 88 L.Ed.2d 846 (1986) (O'Connor, J., concurring)) as having at least some religious significance. And that significance comes alive, of course, whenever living people use the stable for reenactments of the nativity. On balance, therefore, we are inclined to think that without a disclaimer, the precedents point toward the conclusion that the unadorned stable would represent an impermissible endorsement of religion.

Once the Governor complies with the district court's order, however, we have a contextual change of some significance—for now the stable is accompanied by a prominent and clearly worded disclaimer. Whether or not the disclaimer is effective as a matter of law, it is unambiguous as a matter of English. As long as our "reasonable observer" can read the language, and assuming that the observer is not a complete doubting Thomas as far as governmental pronouncements are concerned, the Commonwealth has given the observer a plain and straightforward answer to the question whether the display constitutes an endorsement of any religion or religious doctrine. The answer is no: "This display ... does not constitute an endorsement by the Commonwealth of any religion or religious doctrine."

The impact of the Commonwealth disclaimer is strengthened, we believe, by the fact that the observer is also told that the area is a public forum available to all. The message thus sent to Christians and non-Christians alike is that the Commonwealth offers equal opportunity encouragement for the celebration of whatever winter holiday any responsible citizen, or civic group, or religious group may wish to observe. The Ebenezer Scrooges of this world might prefer business as usual, to be sure, but the Constitution prohibits only the establishment of religion, not the facilitation of periodic public festivities of a nonexclusionary nature.

The plaintiffs dismiss the court-ordered signage as a "sham," but the record contains no evidence of the defendant's actual state of mind when he decided to comply with the court's conditions. If actions speak louder than words, moreover, it is obviously significant that the Common-

wealth has opened the stable to use by secular and non-Christian groups on an equal footing with Christian groups, and has made this fact known to the public. The cynic may detect a faintly Orwellian note in many of the things governments say on many subjects, but our sense is that as far as the signs at issue here are concerned, the average Kentuckian would be likely to take them pretty much at face value.

The *Allegheny County* case had not been decided by the Supreme Court at the time of the district court's decision here, but the Court of Appeals for the Third Circuit had already delivered itself of an opinion in which the court concluded that Allegheny County had acted unlawfully in allowing a local Holy Name Society to place a crèche inside the main entrance of the Allegheny County courthouse. (The Third Circuit opinion is reported at 842 F.2d 655.) A sign in front of the crèche said "[t]his display donated by the Holy Name Society." The opinion of the district court in the instant case says that "[a] disclaimer was also displayed," 701 F.Supp. at 1307, but that is not correct; there was no disclaimer in the Allegheny County courthouse.[3] In the absence of any disclaimer, Justice Blackmun, speaking for the Supreme Court, said that the sign disclosing ownership of the crèche by a religious society "simply demonstrates that the government is endorsing the religious message of that organization, rather than communicating a message of its own." 492 U.S. at ——, 109 S.Ct. at 3105, 106 L.Ed.2d at 499. The case at bar, in contrast, contains no message of ownership by a religious society, and the sign displayed by the Commonwealth is an express disclaimer, not an implied endorsement.

**3.** In its highly commendable effort to get an opinion out as early in the holiday season as possible—an effort that probably explains other occasional infelicities in the opinion—the district court may momentarily have confused the facts in *Allegheny County* with those in *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir.1987). See *id.* at 123, where the Seventh Circuit explained that the crèche in that case, which was displayed in the lobby of the Chicago City–County Building, was accompa-

nied by disclaimer signs reading "Donated by the Chicago Plasterers Institute—this exhibit is neither sponsored nor endorsed by the Government of the City of Chicago." Quoting the lower court, the Seventh Circuit observed that "a disclaimer of the obvious is of no significant effect," *id.*—but in *City of Chicago* the courts were not dealing with a structure that was unadorned by religious statuary and that had been made available for use by groups representing any religion and none.

If the message conveyed by Kentucky's stable *cum* disclaimer is readily distinguishable from that conveyed by the Holy Name Society crèche in the Allegheny County courthouse, we think that the message conveyed by the other religious symbol involved in *Allegheny County*—an 18-foot Chanukah menorah displayed outside a city-county office building—comes a good deal closer to the message in the case now before us. The menorah (which, like Kentucky's stable, was visually linked to a large Christmas tree) also had a sign. The text of that sign was as follows:

"SALUTE TO LIBERTY

During this holiday season, the City of Pittsburgh salutes liberty. Let these festive lights remind us that we are keepers of the flame of liberty and our legacy of freedom." 842 F.2d at 658. Justice Blackmun, at least, read this as confirmation that "the display of the menorah is not an endorsement of religious faith but simply a recognition of cultural diversity." 492 U.S. at ——, 109 S.Ct. at 3115, 106 L.Ed.2d at 511. If a "salute to liberty" sign can help negate any implication of an endorsement of religion, it seems to us that a sign explicitly denying any endorsement of religion ought to help even more.

We recognize, of course, that the effectiveness of the disclaimer sign must be evaluated in light of the context in which the sign is displayed. Thus in *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), where the Commonwealth required the posting of a copy of the Ten Commandments on the wall of each public classroom in the state, the Supreme Court held that the absence of a secular legislative purpose could not be cured by requiring the following notation to be appended in small print at the bottom of each copy of the Ten Commandments:

"The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." 449 U.S. at 41, 101 S.Ct. at 193.

We doubt that *Stone v. Graham* is controlling here. In the first place, the Supreme Court has squarely held that there are legitimate secular purposes for displays that celebrate the Christmas holiday and depict its origins. *Lynch v. Donnelly*, 465 U.S. 668, 680–81, 104 S.Ct. 1355, 1362–63, 79 L.Ed.2d 604 (1984). The same secular purposes that make it legitimate for Congress to declare Christmas Day a legal public holiday, see 5 U.S.C. § 6103, make it legitimate for state and local governments to decorate their governmental seats for the holiday season. The Supreme Court held as a matter of law that there could be no such secular purpose behind the Ten Commandments statute at issue in *Stone v. Graham*.

In the second place, the Ten Commandments statute was aimed at a captive audience of school children who would have had to live with the Commandments, if not by them, throughout the school year. In the case at bar, on the other hand, there has been no showing that any child would have to view the Christmas decorations at the state capitol under compulsion, and the decorations are displayed there for only a few weeks' time in any event. Here the Commonwealth's disclaimer of any religious endorsement is not presented in the "small print" mentioned in *Stone v. Graham*, moreover, but in letters readable from a moving automobile.

The real issue, it seems to us, is whether the presence of the stable on the grounds of the state capitol conveys such an "overwhelming message of endorsement," to borrow Justice Blackmun's phrase, that in reality no mere sign can effectively disclaim it. See *Allegheny County*, 492 U.S. at ——, 109 S.Ct. at 3114, 106 L.Ed.2d at 511. The visual impact of a nativity scene can be very strong, of course, as the centuries have demonstrated. In the age of television, with literacy declining, perhaps an image such as this is simply too powerful to be allowed under any circumstances. But that was not the conclusion reached by the Supreme Court in *Lynch*, where even without an express disclaimer, non-religious Christmas decorations and figurines were deemed sufficient to lend secular

sanctification to the display of a publicly-owned crèche, "viewed in the proper context of the Christmas Holiday season." 465 U.S. at 680, 104 S.Ct. at 1362.

The stable with which we are concerned here must also be viewed in the context of the holiday season. And the effectiveness of the "prominently displayed" disclaimer sign "immediately in front of the stable structure" must be evaluated not only in light of the fact that the structure is on view only for the few weeks between Thanksgiving and Christmas, but also in light of the fact that it is not accompanied by any religious statuary whatever, the fact that the Commonwealth has also erected extensive holiday decorations of a non-religious nature, and the fact that the structure is available for use by everyone, as everyone is expressly told. Taking all these considerations into account, we agree with the district court's conclusion that the signage is effective to negate any implication of an endorsement of a religion.

## IV

■■■■ The plaintiffs argue that the district court abused its judicial role by holding that if the defendant complied with the remedial measures specified in the court's order, the stable would not be banned. According to the plaintiffs, the court rendered "an 'advisory opinion' that was prohibited by Article III's requirement of an 'actual case or controversy.'"

We see no merit in this argument. If the plaintiffs have standing, as we hold they do, the case or controversy requirement is obviously met here. The plaintiffs' complaint set forth the existence of a justiciable controversy and concluded with a prayer that the district court "grant such further relief to which plaintiffs may be entitled." That is just what the court did.

The essence of equity jurisprudence is "the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944). What the district court did here, essentially, was to provide that the prescribed signs be posted, the

prescribed regulations adopted, and the public funds condition met, on pain of more sweeping relief being ordered. It was precisely to assure compliance with the conditions set forth in the order, as the final paragraph of the order says in so many words, that the court "retain[ed] continuing jurisdiction of this matter." Surely a district court may enter an order concerning the size, visibility, and message of an appropriate disclaimer sign. That is exactly what the Court of Appeals for the Second Circuit ordered the district court to do in *McCreary v. Stone,* 739 F.2d 716, 728 (2d Cir.1984), *aff'd by an equally divided court,* 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985). See also *Allen v. Morton,* 495 F.2d 65, 90–91 (D.C.Cir.1973) (Leventhal, J., concurring):

"If the decision is to have the government terminate its relationship with the Pageant, the district court will enter an injunction requiring the government to post a new set of plaques. These plaques should be designed for maximum exposure and readibility to the sole purpose of stating that the government in no way sponsors the Pageant of Peace event. This message should not, as is presently the case, be obscured by a lengthy description of the origins and nature of the Pageant."

Equally unavailing is the plaintiffs' argument that the erection and maintenance of the stable impermissibly "entangles" the Commonwealth with religion, in violation of the final branch of the test prescribed in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). It is true that the Commonwealth has assumed administrative responsibility for coordinating requests from citizens, civic groups, and religious groups for use of the stable and the adjacent area. Any public forum has a limited physical capacity, however, and as Judge Leventhal pointed out in *Allen v. Morton,* "[p]rinciples of neutrality and nondiscrimination do not require all groups to have access to the same [forum] simultaneously." 495 F.2d at 90. The First Amendment simply does not preclude establishment and enforcement of reasonable

time, place, and manner regulations. *Widmar*, 454 U.S. at 276, 102 S.Ct. at 277. We see no excessive entanglement with religion here.

We have tried to give careful consideration to all of the arguments advanced by the plaintiffs, including those not explicitly addressed in this opinion, and although we find this a difficult case, we are not, in the end, persuaded that the plaintiffs are entitled to more than they have received. The judgment of the district court is AFFIRMED.

WELLFORD, Circuit Judge, dissenting.

Plaintiffs filed suit against the Governor of Kentucky under 42 U.S.C. 1983 asserting violation of the establishment of religion clause of the First Amendment of the Constitution. The complaint sought injunctive and declaratory relief to prohibit further alleged unconstitutional conduct. The complaint alleged, among other things, that:

> "On November 28, 1988 the state held a ceremony to unveil the structure. The ceremony took place on state property and used state funds."

> "At the ceremony, the stable was adorned to depict the Biblical version of Jesus' birth. . . ."

> "The structure for housing nativity scenes stands as a separate entity and is not part of a comprehensive seasonal display."

> "In the entire area of the State Capitol, the only other Christmas decorations are a large evergreen tree with Christmas lights, which stands near the front entrance to the Capitol, approximately 100 yards from the structure, and a strand of evergreens which hang on the Capitol facade."

The parties stipulated that the Commonwealth had erected "a nativity scene on the grounds of the State Capitol," and that it had been "constructed by state workers on state time and at state expense" (approximately $2400 cost), and "at the direction of executive branch officials." They further stipulated that:

> "Operation of the State Capitol property is a function of the executive branch of government, under the ultimate authority and control of Governor Wilkinson."

> "At all times relevant to this complaint, the defendant and his agents were acting under color of state law."

They also stipulated that there was a lighted Christmas tree approximately one hundred yards away and that the nearest tree, decorated with white lights, was approximately 50 yards away, and that there were "no other decorations or adornments . . . within one hundred (100) yards of the nativity scene."

With regard to the alleged ceremony on November 28, 1988, the Commonwealth conceded that there had been "a live reenactment of the nativity scene," with participating children from "Good Shepherd School . . . affiliated with the . . . Catholic Church," which had been invited to furnish these participants. The Bible rendition of the birth of Jesus was reenacted. There had also been a parade.

The Commonwealth finally stipulated about "subsequent use," as follows:

> "The nativity scene remains on the State Capitol grounds and will remain there until around Christmas day."

> "The state has permitted and will permit groups to use the nativity scene for their own live reenactments."

> "The state will not permit the nativity scene to be used for any other purpose. Specifically, the state will not permit its use for secular reenactments of any kind, for reenactment of non-Christian themes, or for reenactment of Christian themes other than the nativity scene."

> "Approval for use of the nativity scene must be secured from a state official in the executive branch. . . ."

> "A state official accepts requests over the telephone for use of the site for a live presentation of a nativity scene, and if no other group has previously scheduled the site for that time period, permission is granted. . . ."

> "The state has no written or oral regulation concerning the use of the land imme-

diately adjacent to or in front of the nativity scene."

The district court made findings upon personally visiting the site, but none should be taken in contravention of what the parties had stipulated.

I find first that plaintiffs had standing as Kentucky residents and concerned citizens to challenge the action taken by the Commonwealth of Kentucky and its Governor. *County of Allegheny v. American Civil Liberties Union*, 492 U.S. ——, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *School District of City of Grand Rapids v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985); *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952); *Hawley v. City of Cleveland*, 773 F.2d 736 (6th Cir.1985). The challenged action which plaintiffs assert to be in violation of the establishment clause took place on State Capital grounds. The "sectarian use" of those grounds impaired the plaintiffs' use and enjoyment of those public grounds, and thus gives these plaintiffs standing. *Allegheny County, supra; Taub v. Commonwealth of Kentucky*, 842 F.2d 912 (6th Cir.1988).

The factual setting of this controversy presented itself through the stipulation of the parties and the admissions of the Commonwealth, which left no doubt as to, and no room for interpretation of, the specific actions and intentions of the Commonwealth and its agents. That particular legal controversy was submitted to the district court based upon *admitted* facts and circumstances.

I, therefore, find no basis or warrant for considering the gloss placed by the district court on these stipulated facts which were based upon its own personal inspection.[1] Viewing the scene from "differing perspectives" in my view is both unnecessary and immaterial in light of the facts and factors expressly relied on by the parties in sub-

mitting the legal controversy for decision. No one indicated, for example, that the stable scene and the structures were "designed to be viewed from afar;" no one indicated whether "a viewer would attempt to look into the structure" when there was no pageant in process.

Such a pageant, as had already occurred on several occasions, had to commemorate the familiar New Testament story of the birth of Jesus; the stable structure could *not* "be used for *any other* purpose." (See Stipulation # 34). It could *not be used* for the "reenactment of non-Christian themes," or for "Christian themes other than the nativity scene." (Stipulation # 34). Approval for a pageant, or for other portrayals or "live reenactments," using the structures provided and paid for by the Commonwealth of Kentucky, had to come from the Commonwealth. In fact, the Commonwealth specifically would not allow the structure to be used for any purpose except to demonstrate, memorialize, and celebrate a central theme of the Christian faith, the birth of Jesus Christ. The Commonwealth alone scheduled as well as approved these "live presentations" at the very steps of the State Capitol where previously there had occurred "demonstrations and other public events."

In view of what are uncontroverted and stipulated facts, I find clearly erroneous the purported factual finding of the district court that "an objective observer viewing the stable structure in the context of the holiday season and of its physical surroundings would interpret it not as an endorsement of religion or any religious doctrine." I find that what the court really did in making the above statement was to reach a legal conclusion based largely on the district court's perceptions which apparently disregarded the express purpose and the particular religious use of the stable and the surrounding structures erected by the Commonwealth.[2] The Commonwealth ad-

---

1. I would agree with this later observation in the district court opinion: "I submit that a federal judge should not be conducting inspections of Christmas decorations thought to be appropriate for its Capitol grounds by a sovereign state."

2. From one "perspective," however, the district court conceded that an objective observer "might reach the conclusion that the presence of the stable constituted an endorsement of Christianity by the Commonwealth."

mitted that the structures in question were either 50 or 100 yards away from trees with ornamental lights placed thereon as a sign of the season. These other decorations at a considerable distance from the structures used and intended to be used only for Christian nativity pageants and live presentations cannot be deemed to be part and parcel of the scene of the crèche and the stable. *See Allegheny County*, 492 U.S. at ——, 109 S.Ct. at 3104 (holding that the floral decoration surrounding the crèche could not be viewed as equivalent to the secular symbols in the display in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)); *see also ACLU v. City of Birmingham*, 791 F.2d 1561 (6th Cir.1986) (where the facts as to the display of a city-furnished nativity scene and figures of the "Christ Child, the Mother Mary, Joseph, three costumed shepherds, and several lambs" were not in dispute).

The majority takes note that the stipulations here were filed after the Third Circuit had indicated disapproval of a nativity scene and setting in *ACLU v. Allegheny County*, at 842 F.2d 655 (3d Cir.1988), and the Supreme Court had approved a crèche and manger scene display in substantially different surroundings in *Lynch*, 465 U.S. 668, 104 S.Ct. 1355. The decision of the Third Circuit in *Allegheny County*, affirmed by the Supreme Court, made it evident that what had been stipulated in this case by the Commonwealth violated the establishment clause. Instead, the district court here relied upon the "lodestar case," *Lynch*, in reaching its decision, but it commented upon "the unfortunate, perhaps unavoidable, ambiguity in the majority opinion" in *Lynch*.[3]

The district court noted this court's opinion in *ACLU v. City of Birmingham*, but was apparently more impressed with Judge Nelson's "strong dissent" therein, which

criticized a " 'Santa Claus too' test." The district court also cited *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir.1987), but devoted equal space and attention to Judge Easterbrook's "vigorous dissent" therein. The *City of Chicago* court reversed the district court and enjoined a crèche and nativity scene in the Chicago City Hall.[4] The district court took particular note of Judge Weis' "scathing dissent" and criticism of this court's opinion in *ACLU v. City of Birmingham* in *Allegheny County*, 842 F.2d at 669. The district court also referred to an article in the Kentucky Law Journal wherein the author concluded (the district court characterized it as "holds") that "[u]nder this approach, governmental involvement with a Nativity scene will rarely violate the establishment clause," 77 Ky.L.J. 61, 115 (1988).

Utilizing the "endorsement" test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the district court held (*inter alia*):

> This court agrees with dissenting Judges Easterbrook and Weis that under *Lynch* there is no justification whatever for an automatic "seat of government" disqualification for a governmentally sponsored religious display.
>
> . . . .
>
> This court holds that the fact that it [the Nativity scene] is located on the grounds of the State Capitol, rather than, say, a state park, is not *per se* determinative.

The district court stated:

> Respectfully, albeit frankly, I don't believe a federal judge has any business inspecting the Christmas decorations on state property to determine if there is enough tinsel, two plastic reindeer, Santa Claus too, or for any other reason unless it is absolutely required in order to protect and defend the Constitution and

---

3. The district court quoted the observation in *Lynch* that "a Santa Claus house, reindeer . . ., candy-striped poles, a Christmas tree . . . such characters as a clown, elephant, and a teddy bear, hundreds of colored lights, and a large banner [with] SEASONS GREETINGS" were present with the crèche and nativity scene. It is obvious that these secular symbols distinguish *Lynch* from the facts of this case.

4. The majority observes that the district court may "have confused the facts in *Allegheny County* with those in *American Jewish Congress v. City of Chicago*, 827 F.2d at 123," particularly with regard to a disclaimer sign also in the City Hall lobby.

laws of the United States. And I submit that it is not.

I submit that the approach of the Second Circuit in *McCreary*[5] provides a model that avoids the necessity of such untoward intrusions by federal judges into state business.

. . . .

... I read the opinion of the *Birmingham* majority as an attempt to be extra certain that no government sponsored religious display be interpreted as an official endorsement of religion.

. . . .

*Birmingham* merely requires the near presence of some secular decorations. Decorations of the kind present on the Capitol grounds in Frankfort and the approaches thereto are sufficient under the *Birmingham* approach, and this court so holds. As indicated by the findings of fact herein, there are problems of perspective in applying the doctrine of *Birmingham* to this case....

The district court then stated that, based on the stipulations and supplemental stipulations submitted by the parties, "[c]onstitutionally, this presents an unacceptable situation, *but one easily remedied.*" (Emphasis added). Had the district court not added the underlined phrase, I would have agreed with its constitutional assessment, even without the added impact of the Supreme Court decision in *Allegheny County*, decided July 8, 1989. It seems evident that the stipulated facts clearly indicated a violation of the First Amendment establishment of religion clause by the Commonwealth of Kentucky.[6]

It was only after this statement that, for the first time, the district court mentioned that the "area at the foot of the Capitol steps is a traditional open forum." This was not a part of the original stipulation but was *directed* by the district court to be added following the hearing on plaintiff's prayer for an injunction. It was the district court's direction then to add this factor and to indicate that a "religious pageant or ceremony" could not be constitutionally excluded from such an area. This theory, however, ignores the holdings in *Birmingham, American Jewish Congress, Stein v. Plainwell Community Schools*, 822 F.2d 1406 (6th Cir.1987), and *Allegheny County*, that a city hall, a public park or stadium, and/or a county courthouse, despite the fact that they are open public places and public fori, may not be the site of a particular state endorsed and approved religious ceremony, observance, or display.

*Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), relied upon by the district court and the majority, is not helpful to defendant. That case merely held that a state university which regularly approved use by various student groups of school facilities upon request could not discriminatorily and in violation of the First Amendment exclude groups involved "in religious work and discussion." 454 U.S. at 269, 102 S.Ct. at 274. In *Widmar* the Court found that there was a secular purpose and that no entanglement with religion existed and therefore held that there was no primary advancement of religion if the university acted to permit a religious group to meet. There is no proper analogy between the state's action here in permitting exclusive use by a particular Christian religious enactment of items furnished at state expense, and the state university's action in *Widmar* in dealing with a request by a *religious group* to share certain facilities with many other non-religious groups. In all respects, the "open forum" concept was an issue created by the district court to find a basis not to enjoin conduct which it found otherwise to be "constitutionally unacceptable." I reiterate that the majority is in error in countenancing this procedure. The district court directed a supplemental stipulation that the state had "*no regulation*" concerning the "use of the land immediately adjacent to ... the nativity scene." (Emphasis added).

---

5. *McCreary v. Stone*, 739 F.2d 716 (2d Cir.1984), *aff'd by an equally divided Court, sub nom., Board of Trustees v. McCreary*, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985).

6. The majority agrees with this conclusion, but believes that the "remedies" proposed by the district court were sufficient to cure the violation.

The majority's holding that it would interpret the district court's rationale that the site "immediately adjacent to the structure" was available to any "responsible religious or civil groups,"[7] as a kind of "open forum" to cure the stipulation whereby the Commonwealth limited the use of the stable scene only to approved Christian groups and the Christian theme of Christ's birth is simply wrong and not supported by the uncontested facts. ("The state *will not permit* the nativity scene to be used for any other purpose.") (Emphasis added).

The district court, in fact, concerned about "any misunderstandings regarding discriminatory usage of the structure by church groups which might be interpreted as endorsement of religion ..."[8] required that a written notice be displayed by the defendant in the future explaining that the state was no longer doing what it had expressly stipulated it had been doing—giving approval only to certain religious groups to use the structure and nativity site for the specific Christian purpose.

The district court, then, to overcome what it at least strongly doubted was constitutional in the face of plaintiffs' challenge, and to allay "fears that the Commonwealth is endorsing a religion,"[9] decided to establish new factual criteria, set up by the district judge himself, by which to assess the constitutionality of practices and conduct already engaged in by the defendant, and the purpose of which had already been stipulated. By so doing, the district court rendered what amounted to an advisory opinion, and it, has done what it professed to be inappropriate for it to do—substitute its own views or perceptions for the stipulated facts and for the law in this area established by this court in *Birmingham.*

Of course, the district court could not foretell the clarification of the law in this area by the Supreme Court, supporting the views expressed in *Birmingham* and through *Allegheny County.* To help assure that its approval of what the Commonwealth had done was not erroneous, the court required that expenditures conceded to have been already made by the Commonwealth (understandably to be "of some concern") "be defrayed with private funds." By this rearrangement of the facts, the district court observed then somehow that it "would constitute a minimal interference with state affairs," and later added that it might be deemed an acceptable "expenditure of public funds for incidental religious purposes."

That the district court was in error in its construction of the actual uncontroverted and stipulated facts, regardless of its unnecessary added "perceptions" and required conditions of disclaimer, repayment and opening the closed and exclusive "forum," may be seen by its statement that "the initial ceremony" described in the findings of fact seems to the court to be an "excellent proper use of the facility." That use referred to, of course, was exclusive, on the very steps of the State Capitol, and without any disclaimer about obvious endorsement by the Commonwealth, which had expended public funds to bring it about. This court should surely not put its stamp of approval on such a notion.

I must differ from my brethren in their effort to distinguish this case from *Birmingham* and *Allegheny County.* They agree, however, that, without the disclaimer heretofore discussed, "the unadorned stable would represent an impermissible endorsement of religion." To that extent,

---

7. Availability under these conditions will still impose upon the state the impermissible responsibility under the First Amendment to decide which petitioning group was "responsible" and which was "civic," rather than irresponsible, unacceptable or not "civic" (perhaps a group of non-residents of Frankfort not "civic-minded" in the usual sense).

8. The district court, then, was attempting by its own imposition of future conditions and requirements to make the nativity scene and adjacent area a public forum "available on an even-handed basis."

9. The district court declared that "a disclaimer is necessary [so] that the structure is not to be construed as an endorsement of religion." (The district judge "in the exercise of equitable powers" then prescribed the "forceful" language to be used in the disclaimer to make the conduct involved pass constitutional muster).

we are all in agreement at least, and I believe a reasonable reading of the district court's opinion would also indicate its accord.

What the majority has mistakenly permitted, in my view, is the alteration of the extensive stipulated facts which set out clearly the intent of the Commonwealth in doing what it did, and substituting in their stead other facts and factors initiated by the district court on its own volition into this controversy. The court required disclaimer sets the real facts on their head. The disclaimer permits the Commonwealth to say "we didn't mean what we said was the exclusive purpose of this Christian nativity display, and we didn't spend the public funds we really spent to do it." I cannot permit this kind of misrepresentation to be approved. This court also, by taking into account the facts and factors added by the district court, has issued an advisory opinion telling the Commonwealth that if it undoes what it has already done, if it says it did not intend what it plainly said it intended to do, and if it does what the court tells it to do about its approval and initiation of the Christmas nativity display in the future, we will approve its conduct.

Even if this kind of action based on the deceptive disclaimer and the phony defraying of public expenses were accomplished legitimately and appropriately, I would still not be able to affirm the action of the district court. Its judgment directed that "the area, as a public forum, is available to all responsible citizens and civic and religious groups...." We cannot say with assurance *what* area the district court was describing. I cannot construe the district court opinion in its entirety as directing that the nativity scene itself, rather than some indefinite surrounding area, was meant to be something it was never intended to be by the Commonwealth—exclusively designated and approved for live reenactments of a basic and sacred Christian celebration. What "responsible citizen" or "religious group", except a Christian entity, would wish to present only a "live reenactment" of the Christian nativity story?

Also, the district court judgment requires the state to draft a "formal written policy" setting forth "reasonable restrictions" on the use of the structure. We are not advised about the content of this policy and the restrictions, but we already know what the previously *stipulated* policy of the Commonwealth was and has been with respect to the nativity site.

Finally, the district court judgment requires the state to determine just which ones among potential applicants (and I find it difficult to conceive of any but Christian groups or persons applying) are "responsible," which may be "civic" whatever that term means, and which group is "religious." It must also decide that what they propose to do at the nativity scene or site is a "holiday ceremony" or a "pageant" or a "display." This judgment puts the Commonwealth in the business of approving, scheduling, and/or rejecting holiday proposals which, I submit, constitutes a separate First Amendment violation. I therefore would reverse and enjoin the Commonwealth's activity in controversy. *See Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), and *Allegheny County, supra.*

Recently, the Second Circuit, in a comparable establishment clause controversy involving a menorah displayed and a Jewish religious observance in a municipal public park, reversed the district court to declare such conduct and practice contrary to First Amendment principles. *See Kaplan v. City of Burlington*, 891 F.2d 1024 (2d Cir. 1989). That court, correctly I submit, overruled the argument of that City that *Board of Trustees of Scarsdale v. McCreary*, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985), or *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), was controlling rather than *Allegheny County:*

> As we see it, *Allegheny* teaches that display of a menorah on government property in this case conveys a message of government endorsement of religion in violation of the Establishment Clause.

*Id.* at 1028.

The *Kaplan* court, reciting the reasons I have attempted to articulate in this dissent,

reached its decision despite the existence of a purported disclaimer sign to the effect that the menorah was sponsored by a Jewish religious organization. The *Kaplan* court also observed, as is the situation in the instant case, that the public park, whether a traditional public forum or not, had never before been used for an express religious purpose and observance. I agree with Chief Judge Feinberg's observation that to rule as the majority has in this case is to permit "the public forum doctrine [to] swallow up the Establishment Clause."

I have written this dissent with some reluctance because I appreciate the difficulty of this kind of First Amendment controversy. I also realize that the district court acted without the benefit of the *Allegheny County* Supreme Court decision. I would, therefore, at a minimum, remand this case to the district court for further consideration in light of *Allegheny County* and the concerns herein expressed concerning its added perceptions to the full set of facts stipulated by the parties and submitted to the court.